## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID AND PAMELA JACKSON** : | |
| : | |
| **Plaintiffs,** : | **Civil Action No.: 09-cv-1549-** |
| : | **MAM** |
| **v.** : | |
| : | |
| : | |
| **REAL ESTATE MORTGAGE NETWORK,** : | |
| **INC.,** *et al.* : | |
| : | |
| : | |
| **Defendants.** : | |
| : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT REAL ESTATE MORTGAGE NETWORK, INC.'S
## MOTION TO DISMISS COUNTS II, III, AND IV OF THE SECOND
## AMENDED COMPLAINT

Defendant Real Estate Mortgage Network, Inc. ("REMN") submits this Memorandum of

law in support of its Motion to Dismiss the Second Amended Complaint as to REMN.

## I.     INTRODUCTION

This case concerns the refinancing of the Plaintiffs', David and Pamela Jackson, primary

residence located at 14 Penn Oake Lane, Oxford, Pennsylvania 19363.  Plaintiffs have filed a

Second Amended Complaint that consists of merely bald assertions devoid of any legal or factual

support with respect to the allegations against REMN.  The Plaintiffs' assertion that they were

fraudulently induced to enter into the refinance agreement (the "Agreement") is clearly

contradicted by the loan documents that are integral to the Plaintiffs' claims.

The Plaintiffs' legal claims fail as a matter of law for several reasons, first and foremost

of which, they are clearly barred by the parol evidence rule.  Here, the parol evidence rule acts to

bar the introduction of any evidence of any prior or contemporaneous oral or written

2

representations which will vary or contradict the explicit terms of the Agreement. Specifically, plaintiffs' assertions that Brett Dexter (employee of REMN) orally informed them that the loan that was being provided to the plaintiffs would not contain a prepayment penalty, and the Federal Truth-In-Lending Disclosure Statement provided by REMN that was clearly an "initial disclosure estimated at the time of [loan] application," are clearly barred from introduction pursuant to the parol evidence rule. Moreover, plaintiffs' claims for violations of the Credit Services Act ("CSA"), Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and claims for fraud/fraudulent misrepresentation are woefully deficient and do not meet the federal pleading requirements.

Consequently, as set forth in greater detail below, the plaintiffs' claims against REMN fail as a matter of law and must be dismissed with prejudice pursuant to Rule 12(b)(6).

## II.   **FACTUAL BACKGROUND**

Plaintiffs have filed a Second Amended Complaint naming REMN as a defendant and bringing counts against REMN for violations of the CSA, UTPCPL and alleging fraud/fraudulent misrepresentation.

In support of their claims, the plaintiffs aver the following. Plaintiffs allege that "[b]etween and on behalf of both Originating Lender [Accredited Home Lenders, Inc.] and Plaintiffs, [REMN] acted as an intermediary to secure and source the subject loan." See Exhibit "A" at ¶ 16. The Originating Lender allegedly "underwrote and originated the loan between itself and Plaintiffs." See Exhibit "A" at ¶ 17. Plaintiffs approached REMN to "refinance their mortgage to lower their interest rate, pay off debts, and obtain a mortgage that would include taxes." See Exhibit "A" at ¶ 20. Plaintiffs allege that they were put in touch with Brett Dexter, REMN's employee, who, after plaintiffs informed him they wanted a loan without a prepayment

3

penalty, "promised the Plaintiffs that they would not have a prepayment penalty." See Exhibit "A" at ¶¶ 22, 23. Dexter thereafter informed the plaintiffs that the best loan that could be procured for them "would have an interest rate of approximately 11%, did not contain a prepayment penalty, would not include taxes, and would not pay off Plaintiffs' debts." See Exhibit "A" at ¶ 26. Dexter allegedly "induced Plaintiffs to accept this mortgage by telling Plaintiffs that [REMN] would refinance Plaintiffs thereafter within one (1) year into a mortgage with the terms Plaintiffs desired." See Exhibit "A" at ¶ 29. Plaintiffs then closed on the loan on July 26, 2006. See Exhibit "A" at ¶ 32. According to Plaintiffs they "specifically looked for, and found the disclosure that stated that there would not be a pre-payment penalty." See Exhibit "A" at ¶ 31; see also a true and correct copy of the initial Federal Truth-In-Lending Disclosure statement provided by REMN attached hereto as Exhibit "B."

The initial Federal Truth-In-Lending Disclosure Statement (the "REMN Initial Disclosure") was dated July 26, 2006, the date of the closing, and was generated by REMN. See Exhibit "B." The REMN Initial Disclosure contained a box that was checked off that indicated that this was an "Initial Disclosure estimated at time of application," while another box to indicate this was a "Final Disclosure based on contract terms" was left blank. See Exhibit "B." The REMN Initial Disclosure also contained a box that was checked off indicating that the plaintiffs would not have a prepayment penalty. See Exhibit "B." The REMN Initial Disclosure explicitly stated "[s]ee your contract documents for additional information regarding nonpayment, default, right to accelerate the maturity of the obligation, **prepayment rebates and penalties**, and the Lender's policy regarding assumption of the obligation." See Exhibit "B," (emphasis added). Furthermore, the document which was signed by the plaintiffs and dated "26 day of 2006" (and did not include the month of signing) stated above the signature line "[t]he

undersigned hereby acknowledges receiving and reading a completed copy of this disclosure along with copies of the documents provided. **The delivery and signing of this disclosure does not constitute an obligation on the party of the lender to make, or the Borrower(s) to accept, the loan as identified.**" See Exhibit "B" (emphasis added).

According to the Second Amended Complaint, approximately one year later, in 2007, plaintiffs were contacted by Paul Walker, another employee of REMN, for the "promised refinance." See Exhibit "A" at ¶ 35. Allegedly Walker informed the plaintiffs that REMN had "found them a refinance that would pay off Plaintiffs' existing debt, including but not limited to a vehicle loan and doctors bills; have approximately a 6% fixed interest rate; and include an escrow for taxes." See Exhibit "A" at ¶ 36. Shortly thereafter, however, Walker "informed Plaintiffs that Plaintiffs did not qualify for this refinance as their 2006 mortgage included a five (5) year prepayment penalty (concealed)." See Exhibit "A" at ¶ 38. Allegedly due to this prepayment penalty, plaintiffs "could not refinance their mortgage without incurring an approximate eleven thousand dollar ($11,000.00) penalty, which is cost prohibitive." See Exhibit "A" at ¶ 44. In addition, Plaintiffs were allegedly also "unable to refinance; fell behind on their taxes and were unable to pay other, unsecured debt." See Exhibit "A" at ¶ 45.

Allegedly after obtaining a copy of the mortgage assignee's file in 2007, the Plaintiffs "discovered that there was conflicting paperwork: Plaintiffs' 'initial' Truth in Lending Disclosure [the REMN Initial Disclosure] disclosed no prepayment penalty but the 'final' TIL revealed the existence of the prepayment penalty." See Exhibit "A" at ¶ 42. At the July 26, 2006 closing for the loan, however, Plaintiffs executed a Note with Prepayment Charge Rider to Note and a Final Truth in Lending Disclosure (the "Final Disclosure") that provided for a

prepayment penalty.[1] <u>See</u> a true and correct copy of the Final Disclosure attached hereto as Exhibit "C"; <u>see</u> <u>also</u> a true and correct copy of the Note and Prepayment Charge Rider to Note attached hereto as Exhibit "D." The Final Disclosure, signed by the Plaintiffs and dated "7-26-06" clearly states at the top of the document that it is a "Final Truth-In-Lending Disclosure Statement." <u>See</u> Exhibit "C." In addition, it is worthy to note that there are no boxes present on the Final Disclosure, as there were on the REMN Initial Disclosure, to check off to indicate if the disclosure was either an "Initial Disclosure estimated at time of application" or a "Final Disclosure based on contract terms." <u>See</u> Exhibits "B" and "C." The Final Disclosure also states that the lender is Accredited Home Lenders, Inc., contains a prepayment penalty and is dated July 26, 2006, the day of the loan closing. <u>See</u> Exhibit "C."

The Note and Prepayment Charge Rider to Note (the "Prepayment Charge Rider") were also signed by the Plaintiffs at closing and dated July 26, 2006. <u>See</u> Exhibit "D." The Prepayment Charge Rider contained the following relevant terms:

> THIS PREPAYMENT CHARGE RIDER TO NOTE is made this 26th day of July, 2006, and is incorporated into and shall be deemed to amend and supplement the Note or Adjustable Rate Note, as applicable (the "Note"), of the same date given by the undersigned Borrower(s) to Accredited Home Lenders, Inc. A California Corporation.

NOTICE TO THE BORROWER

> DO NOT SIGN THIS PREPAYMENT CHARGE RIDER TO NOTE BEFORE YOU READ IT. THIS PREPAYMENT CHARGE RIDER TO NOTE

---

[1] On a motion to dismiss, courts can consider the allegations of the complaint, exhibits attached to the complaint, matters of public record, and any undisputedly authentic document that a defendant attaches to a motion to dismiss if the plaintiff's claims are based on the document. <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 222 n.3 (3d Cir. 2004); <u>Pension Benefit Guaranty Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993). Attached to this motion are copies of the REMN Initial Disclosure and the Final Disclosure, as well as Note and a copy of the Prepayment Charge Rider to Note signed by the Plaintiffs on July 26, 2006. As these documents are clearly at issue here, this Honorable Court can consider them for purposes of this Motion.

PROVIDES FOR THE PAYMENT OF A PENALTY IF YOU WISH TO REPAY THE NOTE PRIOR TO THE DATE PROVIDED FOR REPAYMENT IN THE NOTE.

\* \* \*

PREPAYMENT CHARGE

\* \* \*

I/we confirm that, prior to the closing of this mortgage loan, I/we were offered the option of obtaining a mortgage loan that did not require payment of a prepayment charge and that I/we are agreeing to this prepayment charge in exchange for a monetary benefit, including but not limited to a rate or fee reduction.

See Exhibit "D." The Plaintiffs then signed and dated the Prepayment Charge Rider under these relevant and conspicuous terms. See Exhibit "D."

Based on Plaintiffs' assertions, Plaintiffs bring four (4) causes of action: Count I for Truth-in-Lending Act violations (not against REMN); Count II for Credit Services Act violations; Count III for Unfair Trade Practices and Consumer Protection Law violations; and Count IV for fraud/fraudulent misrepresentation. For the reasons set forth below, the claims against REMN fail as a matter of law and must be dismissed pursuant to Rule 12(b)(6).

**III.   ARGUMENT**

**A.   Standard or Review**

According to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a Court should dismiss a complaint that fails to state a claim upon which relief can be granted. When evaluating a motion to dismiss under Rule 12(b)(6), the Court should accept as true all allegations made in the complaint. While viewing the complaint in the light most favorable to the plaintiff, however, the Court is not required to accept allegations that amount to "mere legal conclusions," "bald assertions without any factual support," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions in the

form of factual allegations." Morse v. Lower Merion School District, 132 F.3d 902, 906 n.8 (3d

Cir. 1997); see also Jenkins v. McKeithern, 395 U.S. 411, 412-22 (1969).  Furthermore,

"conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice

to prevent a motion to dismiss." General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d

296, 333 (3d Cir. 2001).

    In Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955 (2007), the United States

Supreme Court outlined a more stringent pleading standard, emphasizing that "[w]hile a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." Id. at 1965.  The Supreme Court continued, "[f]actual allegations must be enough

to raise a right to relief above the speculative level." Id.  Here, even when liberally construing

the claims set forth in the Second Amended Complaint, the best that can be said of them, as to

REMN, is that they constitute a "formulaic recitation of the elements of a cause of action." Id.

The United States Supreme Court has recently reaffirmed Twombly in Ashcroft v. Iqbal, 129

S.Ct. 1937, 1953 (May 18, 2009), unequivocally holding that, "[o]ur decision in Twombly

expounded the pleading standard for 'all civil actions' ..." Id.

    In this case there are no factual allegations against REMN that past muster and justify the

claims asserted.  Moreover, as will be discussed below, the Plaintiffs' claims fail as a matter of

law as they are barred by the parol evidence rule.

**B.    PLAINTIFFS' CLAIMS ARE BARRED PURSUANT TO THE PAROL
EVIDENCE RULE BECAUSE THE PLAINTIFFS CANNOT INTRODUCE
ANY EVIDENCE OF PREVIOUS OR CONTEMPORANEOUS ORAL OR
WRITTEN REPRESENTATIONS TO ALTER, MODIFY OR
CONTRADICT THE EXPRESS TERMS OF THE LOAN AGREEMENT.**

Plaintiffs' claims are clearly barred by the parol evidence rule which acts to preclude the
introduction of any previous or contemporaneous oral or written representations, such as
statements made by Brett Dexter and/or the REMN Initial Disclosure, that would seek to alter,
vary or contradict the express terms of the Agreement.  It is undisputed that the Plaintiffs signed
the loan documents and entered into the Agreement at the loan closing on July 26, 2006.  Also
undisputed is the fact that the Final Disclosure statement, signed and dated by the Plaintiffs on
July 26, 2006, and the Prepayment Charge Rider contained express terms providing for a
prepayment penalty on the mortgage.  The gravamen of Plaintiffs' Complaint is that they were
fraudulently induced to enter into the Agreement by Brett Dexter, an REMN employee, who
allegedly made previous oral representations to the Plaintiffs that the loan that was being
procured would not have a prepayment penalty.  In addition, Plaintiffs attach the REMN Initial
Disclosure statement to their complaint and contend that they relied on this disclosure to induce
them to enter into the Agreement.  As discussed below, these oral and written representations are
clearly barred by the parol evidence rule and Plaintiffs' claims fail as a matter of law.

Pursuant to the parol evidence rule, as interpreted by Pennsylvania Courts, evidence of
prior or contemporaneous oral or written negotiations or agreements is generally inadmissible to
explain or vary the terms of a contract that covers or purports to cover the entire agreement of the
parties.  Yocca v. The Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004).  "The parol
evidence rule provides that the terms of a written contract cannot be varied, contradicted, added
to, or modified by parol evidence."  Seidman v. The American Express Co., 523 F. Supp. 1107,

1109 (E.D.Pa. 1981). The parol evidence rule is a matter of substantive law and not a rule of evidence. O'Brien v. O'Brien, 362 Pa. 66, 66 A.2d 309 (1949). The rule mandates that when an agreement has been reduced to a writing by the parties, the writing is the sole evidence of, and hence constitutes, the agreement. Crompton-Richmond Co., Inc. - Factors v. Smith, 253 F. Supp. 980, 982-83 (E.D.Pa. 1966). "[P]arol evidence is admissible to explain and supplement, but not to contradict express provisions of the writing." Id. at 983.

When construing a contract involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. McMahon v. McMahon, 417 Pa. Super. 592, 612 A.2d 1360 (1992) (en banc). As such, the threshold inquiry in a contract interpretation case is whether the contract is ambiguous. Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 613 (3d Cir. 1995); Hullet v. Towers, Perrin, Forster & Crosby, 38 F.3d 107, 111 (3d Cir. 1994). Where the written terms of the contract can only be read one way, the court will interpret the contract as a matter of law. Hullet, 38 F.3d at 111.

Here, the Agreement is clear and unambiguous on its face and the parol evidence rule unequivocally operates to bar the alleged statements made by Brett Dexter regarding the absence of a prepayment penalty in the loan as they constitute prior oral representations that would alter, modify and/or contradict the express terms of the Agreement. See Blumenstock v. Gibson, 811 A.2d 1029, 1035-36 (Pa. Super. 2002) ("a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations").

Moreover, at the closing on July 26, 2006, the plaintiffs clearly signed and acknowledged that the Agreement contained a prepayment penalty by executing both the Final Disclosure statement and the Prepayment Charge Rider to the mortgage note, as well as the mortgage Note itself, which indicated that there was a prepayment charge rider attached. It is assumed that

Plaintiff will assert that the terms of the Agreement are ambiguous due to the existence of the REMN Initial Disclosure statement, which did not provide for a prepayment penalty. This specious argument ignores the plain reality of the matter that REMN acted as mortgage broker, or intermediary, in procuring a loan for the plaintiffs. A fact which is acknowledged by the Plaintiffs. See Exhibit "A" at ¶ 16. Thus, the final Truth in Lending disclosure would necessarily come from the actual lending institution, Accredited Home Lenders, Inc., which Plaintiffs acknowledge underwrote the loan. See Exhibit "A" at ¶ 17. This fact is born out by the Final Disclosure document which states "Final Truth-In-Lending Disclosure Statement." See Exhibit "C." Any argument to the contrary is also belied by the clear terms that were included in the REMN Initial Disclosure which provide that it is, in fact, only an "Initial Disclosure estimated at time of application" and not a "Final Disclosure based on contract terms." See Exhibit "B." Moreover, the REMN Initial Disclosure includes the following terms that establish that it was not a part of the Agreement, but instead, an initial disclosure generated by the mortgage broker who did not underwrite the final loan:

> See your contract documents for additional information regarding nonpayment, default, right to accelerate the maturity of the obligation, **prepayment rebates and penalties**, and the Lender's policy regarding assumption of the obligation.

> \* \* \*

> The undersigned hereby acknowledges receiving and reading a completed copy of this disclosure along with copies of the documents provided. **The delivery and signing of this disclosure does not constitute an obligation on the party of the lender to make, or the Borrower(s) to accept, the loan as identified."**

See Exhibit "B" (emphasis added). In fact, even though the REMN Initial Disclosure is dated July 26, 2006, the Plaintiffs only signed and acknowledged the document on the "26 day of 2006." See Exhibit "B." Thus, it is impossible to even discern when the Plaintiffs actually

reviewed and signed the document.  Nevertheless, even assuming that the document was

received by the Plaintiffs on July 26, 2006, it merely constitutes a contemporaneous written

representation that is clearly barred from introduction by the parol evidence rule.  The Final

Disclosure statement and the Prepayment Charge Rider could not speak clearer to the fact that

the Plaintiffs received, acknowledged and signed documents on the date of the loan closing that

provided for a prepayment penalty.

It is also assumed that the Plaintiffs will argue that the parol evidence rule does not

operate here to bar the introduction of evidence to alter, modify or contradict the terms of the

Agreement pursuant to the "fraud" exception to the rule.  "Once a writing is determined to be the

parties' entire contract, the parol evidence rule applies and evidence of any previous oral or

written negotiations or agreements involving the same subject matter as the contract is almost

always inadmissible to explain or vary the terms of the contract."  See Bardwell v. Willis Co.,

375 Pa. 503, 100 A.2d 102, 104 (1953).  However, "[o]ne exception to this general rule is that

parol evidence may be introduced to vary a writing meant to be the parties' entire contract where

a party avers that a term was omitted from the contract because of fraud, accident, or mistake."

Id.  The Plaintiffs' anticipated reliance on this exception is misplaced because the gravamen of

Plaintiffs' Complaint is that the Plaintiffs were fraudulently induced to enter into the Agreement

by the representations of REMN; not that there was any fraud that resulted in the omission of a

term from the Agreement.[2]  The Pennsylvania Supreme Court explained the fraud exception to

---

[2] In fact, it is clear from the Final Disclosure statement and the Prepayment Charge Rider that Plaintiffs
were aware of, and acknowledged in writing, the presence of a prepayment penalty with respect to the
mortgage.  Thus, it cannot be argued that there was an omission of any term in the final Agreement as
the prepayment term was explicitly set forth.  The only question this court need engage in is "was there
a prepayment penalty or not that was acknowledged by the Plaintiffs in the final Agreement."  The
answer to this question is an unequivocal yes as born out by the Agreement documents attached to this
motion.

the parol evidence rule in <u>Yocca</u> as follows:

> Notably, while parol evidence may be introduced based on a party's claim that there was fraud in the execution of the contract, *I.e.*, that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *I.e.,* that an opposing party made false representations that induced the complaining party to agree to the contract.

854 A.2d at n.26; <u>see</u> <u>also</u> <u>HCB Contractors v. Liberty Place Hotel Assocs.</u>, 652 A.2d 1278, 1279

(Pa. 1995). Here, there is no evidence or even averment that a term of the contract was

fraudulently omitted. Instead, Plaintiffs Complaint is replete with allegations that REMN

fraudulently induced the Plaintiffs to enter into the Agreement including the explicit averment

that "Defendant's [REMN] fraud and fraudulent misrepresentations included, but were not

limited to, intentionally concealing, failing to warn and misrepresenting the loan terms to

Plaintiffs thereby wrongfully inducing Plaintiffs to execute the loan to Plaintiffs' detriment."

<u>See</u> Exhibit "A" at ¶ 82. As such, Plaintiffs' claims do not fall within the fraud exception to the

parol evidence rule.

Based upon the foregoing, the parol evidence rule clearly operates to bar the introduction

of any alleged misrepresentations made by Brett Dexter as to a prepayment penalty, as well as

the REMN Initial Disclosure, and Plaintiffs' claims must be dismissed as a matter of law for

failure to state a claim under Federal Rule 12(b)(6).

### C.   PLAINTIFFS' CLAIM FOR VIOLATION OF THE CREDIT SERVICES ACT FAILS AS A MATTER OF LAW BECAUSE THE ALLEGATIONS ARE MERELY BALD ASSERTIONS WITHOUT ANY LEGAL SUPPORT AND CONSTITUTE UNSUPPORTED LEGAL CONCLUSIONS.

Plaintiffs' Complaint sets forth a claim for violation of the Credit Services Act ("CSA");

however, the count is wholly substantively deficient. Plaintiffs' merely cite to two (2) sections

of the Act and make the bald faced assertion that REMN has violated these sections. There is no

13

factual support set forth for how REMN violated these sections of the CSA and, as discussed above, the facts of this case clearly establish that there was no fraud perpetrated on the Plaintiffs as they were made aware of and acknowledged the presence of a prepayment penalty in the mortgage loan in writing.

> Plaintiffs merely state that REMN violated the CSA for:
>
> a) Making or using any untrue or misleading representations in the offer or sale of the services of a credit services organization or engage directly or indirectly in any act, practice or course of business which operates or would operate as a fraud or deception upon any person in connection with the offer or sale of the services of a credit services organization;
>
> b) Making or using any false or misleading representations or omit any material fact in the offer or sale of the services of a loan broker or engage directly or indirectly in any act that operates or would operate as fraud or deception upon Plaintiffs in connection with the offer or sale of services of a loan broker, notwithstanding the absence of reliance by the Plaintiffs.

These allegations clearly constitute "bald assertions without any legal support" and are "unsupported legal conclusions." This Count clearly does not meet the standard set forth in Twombly requiring that "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 127 S.Ct. at 1965.

Moreover, the basis for these claims is grounded in fraud. As discussed, Plaintiffs maintain that REMN fraudulently induced them to enter into the loan Agreement. This Count fails to meet the heightened pleading requirements of Rule 9(b) that provides "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Here, this Count fails to state with particularity how REMN perpetrated a fraud thereby violating the CSA.

**D.     PLAINTIFFS' CLAIMS FOR VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW FAIL AS A MATTER OF LAW BECAUSE THE CLAIMS FAIL TO MEET THE HEIGHTEND PLEADING REQUIREMENT OF RULE 9(b) AND PLAINTIFFS CANNOT DEMONSTRATE THEY JUSTIFIABLY RELIED ON ANY ALLEGED MISREPRESENTATIONS MADE BY REMN.**

Plaintiffs' claim in Count III, for a purported violation of the UTPCPL, is wholly deficient on its face. Plaintiffs merely list a number of subsections of the UTPCPL they assert were violated, but provide no explanation as to how REMN violated the respective subsections. Similar language pleaded by Plaintiffs' counsel has recently been rejected by this Court on a 12(b)(6) Motion:

> To state a claim under the UTPCPL, a plaintiff must "allege with particularity the elements necessary to support a violation ... as to the particular Defendant (citations omitted). Plaintiffs' UTPCPL claim against MERS, however, just like their FCEUA claim, is nothing more than "labels and conclusions" and a "formulaic recitation of the elements of a cause of action." See Twombly, 127 S.Ct. at 1965. Plaintiffs have pled no facts that plausibly suggest that MERS misrepresented the nature, characteristics or status of the loan, or that the loan would be beneficial to Plaintiffs. They do not allege that MERS imposed any credit costs on them, and do not specify what, if anything MERS may have done to violate the laundry list of statutes and laws referenced within the Count ...Accordingly, we grant MERS' Motion to Dismiss insofar as it seeks dismissal of the UTPCPL claim against it.

Hartman v. Deutsche Bank Nat'l Trust Co., 2008 WL 2996515, *4 (E.D.Pa. Aug. 1, 2008); see also Wenglicki v. Tribeca Lending Corp., 2009 WL 2195221, at *6 (E.D.Pa. July 22, 2009) (dismissing UTPCPL claim where plaintiff alleged that a FECUA violation was a per se violation of the UTPCPL).

In Morilus v. Countrywide Home Loans, Inc., No 07-cv-900, 2008 WL 5377627, at *13 (E.D.Pa. Dec. 22, 2008), this Court previously rejected virtually identical allegations concluding that the UTPCPL claims cannot be predicated upon alleged violations of TILA and RESPA. Plaintiffs have improperly attempted to bootstrap alleged violations of many other statutes into a

UTPCPL claim.  See Exhibit "A" ¶ 79(b) (alleging "per se" violations of UTPCPL based on alleged violations of TILA and CSA).

Further, Plaintiffs have failed to meet the heightened pleading requirements of Rule 9(b). The "underlying foundation" of the UTPCPL is "fraud prevention."  See Commonwealth v. Monumental Properties, Inc., 329 A.2d 812, 816 (Pa. 1974).  Plaintiffs must establish the following six elements of a prima facie case for common law fraud by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  See Rock v. Voshell, 397 F. Supp. 2d 616, 622 (E.D. Pa. 2005) (citing Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994)).  Therefore, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) are likewise applicable to causes of action under the UTPCPL.  See In re Balko, at 696.  See also Fass, 2006 WL 2129098, at *2.

To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's alleged wrongful conduct or representation and that he suffered harm as a result of that reliance.  See Yocca, 854 A.2d at 438.  In Yocca, the plaintiffs brought an action against the Pittsburgh Steelers Sports, Inc. (the "Steelers") over a dispute dealing with the sale of "stadium builder licenses" ("SBLs"), which are essentially licenses that permit the licensee to purchase annual season tickets to Pittsburgh Steelers football games.  Id. at 428.  In October 1998, the plaintiffs received a brochure (the "SBL Brochure") from the Steelers advertising the construction of a new football stadium and advising them of the opportunity to purchase SBLs for games in that stadium.  Id.  The plaintiffs alleged that they relied on certain

16

representations made in the brochure in deciding to purchase the SBLs. Id. at 429. Thereafter, the plaintiffs were sent an SBL Agreement which "specified the number of SBLs the licensee would be purchasing, the section (or sections) in which the SBL seats would be located, and the total fee for the SBLs." Id. at 430. The plaintiffs, after executing their respective SBL Agreements, then brought an action, including a count for violation of the UTPCPL, against the Steelers alleging that the seats were not located where they expected them to be based upon representations made in the SBL Brochure.

The Pennsylvania Supreme Court, in reversing the Commonwealth Court's order, and finding in favor of the Steelers held:

> Appellees' UTPCPL claims, like all of the other claims in their complaint, are premised on the representations made by the Steelers before the parties entered into the SBL Agreement, particularly, the representations made in the SBL Brochure. According to Appellees, they are entitled to relief because they justifiably relied on these representations in deciding to purchase their SBLs and they suffered damages as a result of that reliance. However, given this Commonwealth's adoption of the parol evidence rule, Appellees simply cannot be said to have justifiably relied on any representations made by the Steelers before the parties entered into the SBL Agreement.

Id. at 439. Likewise, here, Plaintiffs cannot be said to have justifiably relied on the oral representations of Brett Dexter or the REMN Initial Disclosure when it is manifestly clear that they were made aware of the prepayment penalty and in fact signed three (3) documents acknowledging the penalty on the date of the loan closing: (1) the Final Disclosure; (2) the mortgage Note; and (3) the Prepayment Charge Rider.

**E.    PLAINTIFFS CLAIM FOR FRAUD/FRAUDULENT MISREPRESNTATION AGAINST REMN FAILS AS A MATTER OF LAW FOR FAILURE TO MEET THE HEIGHTENED PLEADING STANDARD OF RULE 9(b).**

Plaintiffs' Count for Fraud/Fraudulent misrepresentation merely sets forth two paragraphs averring that REMN's fraudulent misrepresentations "included, but were not limited

17

to, intentionally concealing, failing to warn and misrepresenting the loan terms to Plaintiffs thereby wrongfully inducing Plaintiffs to execute the loan to Plaintiffs' detriment" and "Plaintiffs justifiably and detrimentally relied upon the material fraud and fraudulent misrepresentations of [REMN]." See Exhibit "A" at ¶¶ 82, 83.      Notwithstanding that Plaintiffs' claim for fraud/fraudulent misrepresentation fails due to the inability to establish justifiable reliance, as discussed above; this Count is woefully deficient and fails to meet the heightened pleading standard of Rule 9(b).  Mere bald faces assertions such as those set forth in Count IV of the Complaint do not meet the heightened pleading requirement for pleading fraud under Rule 9(b) and, consequently, this Count must be dismissed with prejudice as to REMN.

## IV.     CONCLUSION

For the foregoing reasons, Defendant, Real Estate Mortgage Network, Inc. respectfully requests that this Honorable Court grant its Motion to Dismiss all Counts of the Complaint against it with prejudice for failure to state a claim pursuant to Federal Rule 12(b)(6).[3]

Respectfully submitted,

/s/ Lance S. Forbes
Lance S. Forbes, Esquire (PA I.D. No. 92380)
THE LAW OFFICE OF LANCE S. FORBES, LLC
112 Center Street
Moorestown, New Jersey 08057
(856) 793-7133
*Attorney for Defendant, Real Estate Mortgage Network, Inc.*

Dated: May 10, 2010

---

[3] See e.g. Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (observing that the district court may exercise its discretion to dismiss claims with prejudice when leave to amend would be futile).

18

## CERTIFICATE OF SERVICE

I, LANCE S. FORBES, hereby certify that the Motion to Dismiss, Second Amended

Complaint and Memorandum of Law in Support thereof have been filed electronically and are

available for viewing and downloading from the ECF system.  The following have therefore

been served via electronic notice:

Mathew B. Weisberg, Esquire
Prochniak Weisberg, P.C.
7 South Morton Avenue
Morton, PA 19070
*Attorney's for Plaintiff*

And the following have been served via regular mail:

Accredited Home Lenders, Inc.
15253 Avenue of Science
San Diego, CA 92128
*Unrepresented Defendant*

U.S. Bank National Association, as
trustee for the benefit of the holders
of the Asset Backed Funding
Corporation Asset Backed
Certificates, series 2006-HE1
425 Walnut Street
Cincinnati, OH 45202


/s/ Lance S. Forbes
Lance S. Forbes

Dated: May 10, 2010

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

**PROCHNIAK WEISBERG, P.C.**
MATTHEW B. WEISBERG
ATTORNEY ID: 85570
7 SOUTH MORTON AVE.
MORTON, PA 19070
610-690-0801

| | | |
|---|---|---|
| David and Pamela Jackson, | : | |
| Individually & H/W | : | |
| 14 Penn Oak Lane | : | |
| Oxford, PA 19363 | : | |
|       Plaintiffs | : | |
| | : | CIVIL ACTION NO.: 09-1549 |
|     v. | : | |
| | : | |
| Accredited Home Lenders, Inc. | : | |
| 15253 Avenue of Science | : | |
| San Diego, CA 92128 | : | |
| | : | |
|    and | : | |
| | : | JURY OF TWELVE (12) JURORS DEMANDED |
| Real Estate Mortgage Network, Inc. | : | |
| 70 Grand Avenue, Suite 109 | : | |
| River Edge, NJ 07661 | : | |
| | : | |
|    and | : | |
| | : | |
| U.S. Bank National Association, as trustee | : | |
| for the benefit of the holders of the Asset | : | |
| Backed Funding Corporation Asset Backed | : | |
| Certificates, series 2006-HE1 | : | |
| 425 Walnut St. | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
|    and | : | |
| | : | |
| John Does 1-10 | : | |
|       Defendants | : | |

## SECOND AMENDED CIVIL ACTION COMPLAINT

## I.  Preliminary Statement

1.  Otherwise known as an action in "Predatory Lending," this is an action alleging, *inter alia*, unfair or deceptive acts and practices ("UDAP"), as well as regulatory violations specifically pertaining to lending, federal strict liability statutes pertaining to collections, and

2.  This action seeks, *inter alia*:

    a.  Actual and compensatory damages;
        i.  Return of all closing and related costs, including appraisal fee and pre-paid finance charges;
        ii.  Return of all interest charged;
        iii.  Reimbursement of all diminished or lost real estate equity;
        iv.  Payment of all related profits, including yield spread premium and commission;
        vi.  Emotional distress, and pain and suffering;
        vii.  Such other further direct or consequential damages as are known or may become known during discovery or at trial.

    b.  Equitable/injunctive relief;
        i.  Stay of or relief from any pending collection action or activity;
        ii.  Rescission and voiding of any mortgage or like interest;
        iii.  Waiver/forgiveness of any claimed debt/arrearage; and
        iv.  Credit repair.

    c.  Statutory penalties;

    d.  Exemplary relief, including treble and punitive damages; and

    e.  Attorneys fees and costs.

3.  Individually, and jointly and severally, this action requests relief for, *inter alia*, the facts stated or inferred, which are averred upon information and belief or averred as believed will become known in discovery or at trial.

4.     This action may rely on the "Discovery Rule" and the Doctrine(s) of Equitable Tolling/Fraudulent Concealment.

5.     Each and every averment herein is incorporated throughout as if fully set forth at length.

   **II.     Jurisdiction and Venue**

6.     Jurisdiction in this Honorable Court is based on federal question and diversity conferred by 28 U.S.C. §1331 and 1332, respectively; supplemental jurisdiction over state law claims is granted by 28 USC §1367.

7.     Venue lies in this District in that the events giving rise to this claim occurred here, at least one (1) Defendant resides, maintains a principal place of business, is incorporated or does business here, or the subject of this action is situated within this district.

**III.     Parties**

8.     Plaintiffs, David and Pamela Jackson ("Plaintiffs" and/or "Mortgagors"), are adult individuals and husband and wife, at all times material residing at the above-captioned address (hereinafter "Premises").

9.     Defendant, Accredited Home Lenders, Inc. ("Originating Lender"), is a corporation under and by virtue of the laws of the State of California, maintaining its principal place of business at the above captioned address, at all times material acting as Plaintiffs' mortgage lender and/or servicer.

10.     Defendant, Real Estate Mortgage Network, Inc. ("Mortgage Brokerage"), is a corporation under and by virtue of the laws of the State of New Jersey, maintaining its principal place of business at the above captioned address, at all times material acting as Plaintiffs' mortgage brokerage.

11.     Defendants, U.S. Bank National Association, as trustee for the benefit of the holders of

the Asset Backed Funding Corporation Asset Backed Certificates, series 2006-HE1

("Assignee"), is a corporation under and by virtue of the laws of the State of Ohio, maintaining

its principal place of business at the above captioned address, at all times material acting as

Plaintiffs' mortgage assignee.

12.     Defendants, John Doe 1-10, is a moniker for individuals and entities currently unknown

but will be substituted when known, as affiliated, associated or liable hereunder for the reasons

set forth below or inferred therefrom.  Each of these parties are incorporated as Defendants in

each and every Count and averment listed above and below.

**IV.     Operative Facts**

          A.      Introduction

13.     At all times material, Defendants were acting individually, within the course and scope of

their authority and employment, and/or through their agents, servants, work-persons, and/or

employees, respectively.

14.     At all times material, Defendants acted individually and/or on behalf of each other as

agents, servants, work-persons, alter ego's, and/or employees thereof.

15.     Defendants are liable to Plaintiffs, directly, indirectly, contractually, expressly, implicitly,

as a matter of law and/or vicariously, including but not limited to liability via a third-party

beneficiary relationship, and/or via conspiring and/or aiding and abetting.

          B.      Functions of and Relationships Between Parties

16.     Between and on behalf of both Originating Lender and Plaintiffs, Mortgage Brokerage

acted as an intermediary to secure and source the subject loan.

17.     Through Mortgage Brokerage, Originating Lender underwrote and originated the loan between itself and Plaintiffs.

18.     Assignee purchased loan from Originating Lender with the TILA violations apparent on the face of the papers.

C.     The Loan

19.     At all times material, Plaintiffs were borrowers and/or mortgagors subject and/or party to a mortgage and note (collectively "Loan") refinance dated July 26, 2006 ("Closing").

20.     Plaintiffs approached Defendant, Mortgage Brokerage, to refinance their mortgage to lower their interest rate, pay off debts, and obtain a mortgage that would include taxes.

21.     Upon contacting Mortgage Brokerage, Plaintiffs were put in touch with Mortgage Brokerage's employee, Brett Dexter ("Dexter") (non-party).

22.     Plaintiffs expressly told Dexter that Plaintiffs wanted a loan without a prepayment penalty.

23.     Dexter promised Plaintiffs that they would not have a prepayment penalty.

24.     Plaintiffs additionally told Dexter that they were looking for a mortgage that included an escrow for taxes.

25.     After their original conversation, presumably after searching for the best terms for Plaintiffs, Dexter advised Plaintiffs that they would not be able to get Plaintiffs a loan with payments in the range they wanted if taxes were included.

26.     Despite Plaintiffs' above reasons for refinancing, Dexter informed Plaintiffs that the best mortgage available for Plaintiffs would have an interest rate of approximately 11%, did not contain a prepayment penalty, would not include taxes, and would not pay off Plaintiffs' debts.

27.   Under Dexter's proposed mortgage, Plaintiffs monthly payments were approximately $2,000.00 and their taxes were an additional monthly payment of approximately $1,000.00.

28.   Plaintiffs were hesitant to accept this mortgage as it did not contain the terms they desired, did not achieve all of their stated goals, and could potentially be unaffordable as the taxes were not included and did not pay off Plaintiffs' other debts.

### i.   THE BAIT

29.   Dexter induced Plaintiffs to accept this mortgage by telling Plaintiffs that Mortgage Brokerage would refinance Plaintiffs thereafter within one (1) year into a mortgage with the terms Plaintiffs desired.

30.   Dexter told Plaintiffs that he realized that the terms were not great but that the loan did not contain a prepayment penalty so Plaintiffs would be able to refinance in a year.

31.   At Closing, Plaintiffs specifically looked for, and found the disclosure that stated that there would not be a pre-payment penalty.  (Exh. A).

32.   Relying on Dexter's promise to refinance in a year and due to the disclosure stating that there would not be a prepayment penalty, Plaintiffs signed the loan documents at closing, enabling the mortgage to be recorded as a secured lien against Plaintiffs' home and for Plaintiffs to be personally liable under the note.

33.   Plaintiffs' timely made their mortgage payments for one (1) year.

34.   Plaintiffs justifiably relied on Dexter's promise that the mortgage would not contain a prepayment penalty as they saw the disclosure that did not have the penalty. (Exh. A).

35.   In or around August 2007, Plaintiffs were contacted by Mortgage Brokerage's employee, Paul Walker ("Walker") (non-party) for the promised refinance.

36.    Walker represented to Plaintiffs that he found them a refinance that would pay off Plaintiffs' existing debt, including but not limited to a vehicle loan and doctors bills; have approximately a 6% fixed interest rate; and include an escrow for taxes.

37.    Plaintiffs were thrilled at this news as Mortgage Brokerage was keeping its promise and Walker's proposed mortgage contained the terms Plaintiff initially requested.

       ii.    THE SWITCH

38.    Shortly thereafter, Walker informed Plaintiffs that Plaintiffs did not qualify for this refinance as their 2006 mortgage included a five (5) year prepayment penalty (concealed).

39.    Plaintiffs searched through their records and found that the paperwork that Plaintiffs received from the closing did not have a prepayment penalty included in the terms. (Exh. A).

40.    Upon Walker's assertion that the loan contained a prepayment penalty, Plaintiffs contacted Defendant, Assignee, regarding the loan documents in Assignee's possession.

41.    Assignee sent Plaintiffs a copy of the file it had been given presumably by Originating Lender.

42.    Upon review of Assignee's file, Plaintiffs discovered that there was conflicting paperwork: Plaintiffs' "initial" Truth in Lending disclosure ("TIL") disclosed no prepayment penalty but the "final" TIL revealed the existence of the prepayment penalty. (Exhs. B & C).

43.    Additionally, Plaintiffs note different Hud-1's. (Exh. D – date day of closing; Exh. E – dated August 1, 2006).

44.    Due to the prepayment penalty, Plaintiffs could not refinance their mortgage without incurring an approximate eleven thousand dollar ($11,000.00) penalty, which is cost prohibitive.

45.    Due to the concealed terms, Plaintiffs were unable to refinance, fell behind on their taxes and were unable to pay other, unsecured debt.

D.    Loan Assignment and Servicing

46.    Thereafter the Closing, the loan was sold by Originating Lender to Assignee, who is liable therefore and thereunder by written agreement and as a matter of law.

47.    On their face, the notices provided to Assignee were defective, placing Assignee on notice of Plaintiffs' claims.

E.    Implied Authority, Joint Venture, Aiding and Abetting Liability, and Ratification

48.    Each party contributed capital, services, skill, and knowledge to the transaction to enable the closing.

49.    Profits were shared between Originating Lender and Mortgage Brokerage derived from the closing and loan.

50.    Originating Lender submitted to Mortgage Brokerage a rate sheet of available interest rates and loan products which Mortgage Brokerage chose the ultimate closing rate and loan terms which became effective after Mortgage Brokerage, with Plaintiffs, satisfied Originating Lender's conditions, which loan application (known as a "1003") was submitted by Mortgage Brokerage to Originating Lender, all resulting in Mortgage Brokerage and Originating Lender's right of mutual control over the transaction.

51.    The Yield Spread Premium ("YSP") to Mortgage Brokerage and disclosed, properly attributable finance charge to Originating Lender makes the loan transaction a joint venture between Originating Lender and Mortgage Brokerage.

52.    This was the only transaction between Plaintiffs, Mortgage Brokerage and Originating Lender, and, upon information and belief, relatively one of the few between Mortgage Brokerage and Originating Lender.

53. Mortgage Brokerage was directed by Originating Lender to do all that was necessary to make the loan close upon the ultimate terms for Mortgage Brokerage and Originating Lender's ultimate profit.

54. Plaintiffs believed and were lead to believe that Mortgage Brokerage was acting on behalf of Originating Lender in formulating the ultimate loan terms. In fact, Mortgage Brokerage acted on behalf of Originating Lender in formulating the ultimate loan terms.

55. Originating Lender, with Mortgage Brokerage, acted pursuant to a common design or plan, and rendered substantial assistance to Mortgage Brokerage, to effectuate the bait and switch.

56. Upon information and belief, Originating Lender was aware or should have been aware that Mortgage Brokerage had applied Plaintiffs for other loans and that Plaintiffs had, in fact, qualified for and were promised the original loan terms by Mortgage Brokerage ("bait"), and Originating Lender nonetheless not only ratified, but encouraged Mortgage Brokerage's change ("switch") of Plaintiffs to the ultimate loan terms for Originating Lender's ultimate benefit.

F. Injuries

57. As a result of the foregoing, Plaintiffs have suffered injuries including, but not limited to: (1) pain and suffering, including emotional distress and embarrassment; (2) damage to credit rating; (3) financial loss(es), including lost opportunity(ies) and/or equity; (4) loss and/or possible loss of the premises; (5) attorneys fees and court costs; and/or (6) such other and further injuries as will be determined in discovery and/or at trial, including aggravation of a pre-existing condition(s).

V. Causes of Action

58.     Paragraphs above are incorporated by reference as if fully set forth at length herein and below.

59.     Plaintiffs are natural people provided with the right to defer payment of debts or to incur payment of debt and defer payment, and the credit offered or extended was primarily for personal, family and/or household purposes.

60.     As a matter of law, Plaintiffs and Defendants are "persons."

61.     Originating Lender and/or Assignee regularly extend consumer credit, six (6) or more loans per year, two (2) or more high cost mortgages per year, and/or one (1) or more of such high cost mortgages through a broker, such as Mortgage Brokerage.

62.     This loan was a federally related mortgage loan, made by a federally-insured depository lender, is HUD-related, and/or was intended to be sold on the secondary market or to creditors who make or invest more than one million dollars a year in residentially secured loans.

<u>COUNT I</u>
**Truth-in-Lending Act ("TILA")**
*Originating Lender and Assignee*[1]

63.     At all times material, Defendants, in the ordinary course of business, extended and arranged for the extension of consumer credit or offered to extend or arrange for the extension of such credit.

64.     The Loan was a residential mortgage loan subject to Plaintiffs' right of rescission and recoupment described by 15 U.S.C. §1635 and 12 C.F.R. §226.23.

65.     This is not a refinancing or consolidation by the same creditor regarding the same property.  15 U.S.C. §1635(e)(2).

---

[1] See above definitions.

66.     In said loan transaction, Plaintiffs did not receive the disclosures required by the Truth-In-Lending Act ("TILA"), 15 U.S.C. §1601, et. seq., and Regulation Z of the Federal Reserve Board ("Regulation Z"), 12 C.F.R §226.1 et seq.

67.     Defendants failed to deliver all "material" disclosures required by TILA and Regulation Z.

68.     Due to the violations of TILA and Regulation Z, Plaintiffs have an ongoing right to rescind.

69.     Plaintiffs either have previously rescinded the loan greater than twenty days prior to the filing of this complaint and Defendants have taken no action to rescind the loan in contravention of their responsibilities under TILA, or, to the extent this Honorable Court may find that Plaintiffs have not already rescinded the loan, Plaintiffs do hereby exercise their right to rescind same and this Complaint shall hereby constitute Plaintiffs' Notice of Rescission pursuant to TILA, 15 U.S.C. §1601, et seq.

70.     Defendant, Assignee, is liable for these violations as arising from facially defective disclosures.

71.     The differing TIL's regarding the differing possibilities of a pre-payment penalty is confusing.

72.     The differing Hud-1's are confusing.

73.     The differing Hud-1's state different pre-paid finance charges.

74.     The differing TIL's fail to consistently highlight the APR and Finance Charge boxes.

75.     The differing TIL's differ with regard to their material disclosures (APR, Finance Charge, Amount Financed, Total of Payments, Monthly Payment due dates).

**COUNT II**
**Credit Services Act ("CSA")**

*Mortgage Brokerage*

76.   Mortgage Brokerage is a Credit Services Organization and Loan Broker as defined under the CSA, 73 P.S. §2182, et seq.

77.   Defendant has violated the CSA for:

> (a) Making or using any untrue or misleading representations in the offer or sale of the services of a credit services organization or engage directly or indirectly in any act, practice or course of business which operates or would operate as a fraud or deception upon any person in connection with the offer or sale of the services of a credit services organization;

> b) Making or using any false or misleading representations or omit any material fact in the offer or sale of the services of a loan broker or engage directly or indirectly in any act that operates or would operate as fraud or deception upon Plaintiffs in connection with the offer or sale of services of a loan broker, notwithstanding the absence of reliance by the Plaintiffs.

## <u>COUNT III</u>
### Unfair Trade Practices And Consumer Protection Law ("UTPCPL")
*All Defendants*

78.   The UTPCPL, 73 P.S. §201-1, et seq., proscribes, *inter alia*, engaging in any "unfair or deceptive acts and practices" either at, prior to, or subsequent to a consumer transaction.

79.   As described, the actions of Defendants constitute unfair or deceptive acts and practices under the UTPCPL, of which Plaintiffs justifiably relied, additionally including, *inter alia*:

> a. Defendants engaged in fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding, 73 P.S. §201-2(xxi);

> b. Defendants failed to comply with TILA and the CSA, respectively, which is a violation of the UTPCPL;

80.   Plaintiffs justifiably relied on Dexter's assertion that there was not a prepayment penalty in the mortgage.

81.   On the face of the documents the loan was intentionally confusing to plaintiffs.

## COUNT IV
## FRAUD/FRAUDULENT MISREPRESENTATION
### *Mortgage Brokerage*

82.     Defendant's fraud and fraudulent misrepresentations included, but were not limited to, intentionally concealing, failing to warn and misrepresenting the loan terms to Plaintiffs thereby wrongfully inducing Plaintiffs to execute the loan to Plaintiffs' detriment.

83.     At all times material, Plaintiffs justifiably and detrimentally relied upon the material fraud and fraudulent misrepresentations of Defendant, which resulted in the above damages.

### VI.     Prayer for Relief

**WHEREFORE**, Plaintiffs request this Honorable Court enter judgment in their favor and against Defendants, individually, jointly and/or severally, in an amount in excess of seventy-five thousand dollars ($75,000), plus such other and further relief as this Honorable Court deems

necessary and just, and to Order the following relief:

    a. Rescission of the loan, including a declaration that Plaintiffs are not liable for any finance charges or other charges imposed by Defendants;

    b. Termination of any security interest in Plaintiffs' property which may have been created under the loan;

    c. Return of any money or property given by Plaintiffs to anyone, including Defendants, in connection with the transaction;

    d. Statutory damages;

    e. Forfeiture and return of loan proceeds;

    f. Damages, including;

        i. Actual damages;

        ii. Treble damages;

        iii. Attorneys fees and expenses, and costs of suit; and

        iv. Punitive Damages.

Weisberg Law, P.C.

/s/ Matthew B. Weisberg, Esquire
MATTHEW B. WEISBERG, ESQUIRE
Attorneys for Plaintiffs

# EXHIBIT B

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (MADE IN COMPLIANCE WITH FEDERAL LAW)

Lender/Broker: Real Estate Mortgage Network, Inc.
Loan No.: 06912298
Borrower(s): David Jackson
Pamela Jackson
Property Address: 14 Penns Oak Ln
Oxford, PA 19363

Date: 07/26/09

[X] Initial Disclosure estimated at time of application

[ ] Final Disclosure based on contract terms

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you assuming the annual percentage rate does not change. | AMOUNT FINANCED The amount of credit provided to you or on your behalf as of loan closing. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled assuming the annual percentage rate does not change. |
|---|---|---|---|
| E 9.805 % | E $ 483376.29 | E $ 226525.71 | E $ 709903.00 |

## YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | * AMOUNT OF PAYMENTS | MONTHLY PAYMENTS ARE DUE BEGINNING | NUMBER OF PAYMENTS | * AMOUNT OF PAYMENTS | MONTHLY PAYMENTS ARE DUE BEGINNING |
|---|---|---|---|---|---|
| 359 | 1975.38 | 08/01/2006 | | | |
| 1 | 1952.18 | 07/01/2036 | | | |

* includes mortgage insurance premiums, includes taxes, hazard insurance or flood insurance.

[ ] **DEMAND FEATURE:** This loan transaction has a demand feature.
[ ] **REQUIRED DEPOSIT:** The annual percentage rate does not take into account your required deposit.
[ ] **VARIABLE RATE FEATURE:** Your loan contains a Variable Rate Feature. Disclosures about the Variable Rate Feature have been provided to you separately.

**SECURITY INTEREST:** You are giving a security interest in:
[ ] the goods or property being purchased. [X] real property you already own.

**FILING OR RECORDING FEES:** $ 275.00
**LATE CHARGE:** If a payment is more than 15 days late, you will be charged $ 98.80 / 5 % of the principal and interest past due.

**PREPAYMENT:** If you pay off your loan early, you
[ ] may [X] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.

**INSURANCE:** Credit life, accident, health or loss of income insurance is not required in connection with this loan. This loan transaction requires the following insurance:
[X] Hazard Insurance [ ] Flood Insurance [ ] Private Mortgage Insurance [ ] Mutual Mortgage Insurance
Borrower(s) may obtain hazard and flood insurance through any person of his/her choice, provided said carrier meets the requirements of the Lender. If Borrower desires Property Insurance to be obtained through the Lender's designated agency, the cost will be set forth in a separate insurance statement furnished by the Lender.

**ASSUMPTION:** Someone buying your house
[ ] may [X] may, subject to conditions, [ ] may not assume the remainder of your loan on the original terms.

See your contract documents for additional information regarding nonpayment, default, right to accelerate the maturity of the obligation, prepayment rebates and penalties, and the Lender's policy regarding assumption of the obligation.
[X] all dates and numerical disclosures except late payment disclosures are estimates.   E   where an estimate.

* The undersigned hereby acknowledge receiving and reading a completed copy of this disclosure along with copies of the documents provided. The delivery and signing of this disclosure does not constitute an obligation on the part of the Lender to make, or the Borrower(s) to accept, the loan as identified.

Read, acknowledged and accepted this   26   day of   8 06

X _David Jackson_ (signature)
David Jackson   (Borrower)

By: BRETT J DEXLER
Title:

X _Pamela Jackson_ (signature)
Pamela Jackson   (Borrower)

(Borrower)

REG750 (06/2007)

Page 1 of 2

# EXHIBIT C

# FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| Borrower Name(s): DAVID JACKSON, PAMELA JACKSON | Lender: Accredited Home Lenders, Inc. A California Corporation 15090 Avenue of Science San Diego, CA 92128 |
|---|---|

Borrower Address:
14 PENN OAK LANE
OXFORD, PA 19363

Date: 07/28/2006  Loan #: 0607058896
Loan Type: Conventional

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.933 % | $483,989.46 | $225,913.82 | $709,903.26 |

### PAYMENT SCHEDULE

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | $1,971.98 | 09/01/2006 | | | |
| 1 | $1,962.46 | 08/01/2036 | | | |

DEMAND FEATURE: [X] This loan does not have a Demand Feature. ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE: ☐ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:
14 PENN OAK LANE
OXFORD, PA 19363

ASSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under the original mortgage terms ☐ may assume, subject to lender's conditions, the remaining balance due under the original mortgage terms.

FILING / RECORDING FEES: $0.00

PROPERTY INSURANCE: [X] Property hazard insurance in the amount of the lesser of the loan amount or replacement cost with a mortgage clause to this lender is a required condition of this loan. Borrower may purchase this insurance from any company acceptable to the lender. ☐ Hazard insurance ☐ is ☐ is not available through the lender at an estimated cost of N/A for N/A year term.

LATE CHARGES: If your payment is more than 10 days late, you will be charged a late charge of 6.000% of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
☐ may [X] will not have to pay a penalty.
☐ may [X] will not be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| Borrower DAVID JACKSON | Date | Borrower PAMELA JACKSON | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

MIN # 100170196079586896
INTARUIC SPE

JACKSON
Page 1 of 1

Loan # 0607058896
Rev. 12/04

**(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)**

| Borrower Name(s): DAVID JACKSON, PAMELA JACKSON | Lender: Accredited Home Lenders, Inc. A California Corporation 15090 Avenue of Science San Diego, CA 92128 |
|---|---|

Date: 07/26/2006  Loan #: 0507655898

Loan Type: Conventional

Borrower Address:
14 PENN OAK LANE
OXFORD, PA 19363

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.933 % | $483,989.46 | $ 225,913.82 | $709,903.28 |

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | $1,974.99 | 09/01/2006 | | | |
| 1 | $1,962.46 | 08/01/2036 | | | |

**DEMAND FEATURE:** [X] This loan does not have a Demand Feature. [ ] This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:** [ ] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:
14 PENN OAK LANE
OXFORD, PA 19363

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms [ ] may assume, subject to lender's condition, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $0.00

**PROPERTY INSURANCE:** [X] Property hazard insurance in the amount of the lesser of the loan amount or replacement cost with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any company acceptable to the lender. Hazard Insurance [ ] is [X] is not available through the lender at an estimated cost of N/A for N/A year term.

**LATE CHARGES:** If your payment is more than 15 days late, you will be charged a late charge of 6.9804% of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
[X] may [ ] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower DAVID JACKSON   7-26-06   Date

Borrower PAMELA JACKSON   7-26-06   Date

Borrower _____ Date   Borrower _____ Date

Borrower _____ Date   Borrower _____ Date

Borrower _____ Date   Borrower _____ Date

JACKSON
Page 1 of 1   Loan # 0507655898   Rev 12/04

# EXHIBIT D

# NOTE

14 PINE OAK LANE
OXFORD, PA 19363
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $232,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Accredited Home Lenders, Inc.**
**A California Corporation**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.625 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on September 1, 2006 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on August 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 502480 San Diego, CA 92150-2480
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,971.98

## 4. BORROWER'S RIGHT TO PREPAY – Prepayment Charge Rider attached hereto.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

0607058896

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-6N (0607)01 Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291 Initials: DJ G
Page 1 of 3

THIS IS A TRUE AND EXACT COPY OF THE ORIGINAL DOCUMENT.

CERTIFIED BY
ACCREDITED HOME LENDERS.
BY:

**5. LOAN CHARGES**

    If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A) Late Charge for Overdue Payments**

    If the Note Holder has not received the full amount of any monthly payment by the end of 10     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     6.080% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B) Default**

    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C) Notice of Default**

    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D) No Waiver By Note Holder**

    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E) Payment of Note Holder's Costs and Expenses**

    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of any different address.

    Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

    I and any other person who has obligations under the Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

0607050856

SN 0357141    Page 2 of 3

Form 3206 1/01
Initials: ___

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_David Jackson_ _____ (Seal)　　_Pamela Jackson_ _____ (Seal)
DAVID JACKSON　　　　　　　-Borrower　　　　PAMELA JACKSON　　　　　　　-Borrower

_____ (Seal)　　_____ (Seal)
　　　　　　　　　　　　　-Borrower　　　　　　　　　　　　　　　　　-Borrower

_____ (Seal)　　_____ (Seal)
　　　　　　　　　　　　　-Borrower　　　　　　　　　　　　　　　　　-Borrower

_____ (Seal)　　_____ (Seal)
　　　　　　　　　　　　　-Borrower　　　　　　　　　　　　　　　　　-Borrower

[Sign Original Only]

0607058896

-6N (0007)01　　　　　　Page 3 of 3　　　　　　Form 3200 1/01

## PREPAYMENT CHARGE RIDER TO NOTE

THIS PREPAYMENT CHARGE RIDER TO NOTE is made this 26th day of July, 2006, and is incorporated into and shall be deemed to amend and supplement the Note or Adjustable Rate Note, as applicable (the "Note"), of the same date given by the undersigned Borrower(s) to Accredited Home Lenders, Inc., A California Corporation.

### NOTICE TO THE BORROWER

**DO NOT SIGN THIS PREPAYMENT CHARGE RIDER TO NOTE BEFORE YOU READ IT. THIS PREPAYMENT CHARGE RIDER TO NOTE PROVIDES FOR THE PAYMENT OF A PENALTY IF YOU WISH TO REPAY THE NOTE PRIOR TO THE DATE PROVIDED FOR REPAYMENT IN THE NOTE.**

The provisions of this Prepayment Charge Rider to Note are authorized by applicable state law or the federal Alternative Mortgage Transaction Parity Act of 1982, 12 U.S.C. §§ 3801 et seq.

### PREPAYMENT CHARGE

I/we may make a full prepayment or partial prepayments. However, if the aggregate amount of the prepayment(s) made during any twelve (12) month period within (Sixty(60)) months of the date of the Note exceeds ten percent (10%) of the original principal amount of the Note, then as consideration for the acceptance of such prepayment(s), I/we agree to pay the holder of the Note a sum equal to five percent (5%) of the entire amount so prepaid. Any prepayments made after said initial (Sixty (60)) month period shall not be subject to any prepayment charge.

I/we confirm that, prior to the closing of this mortgage loan, I/we were offered the option of obtaining a mortgage loan that did not require payment of a prepayment charge and that I/we are agreeing to this prepayment charge in exchange for a monetary benefit, including but not limited to a rate or fee reduction.

| | | | |
|---|---|---|---|
| _David Jackson_  7-26-06 | | _Pamela Jackson_  7-26-06 | |
| Borrower                Date | | Borrower                Date | |
| DAVID JACKSON | | PAMELA JACKSON | |
| | | | |
| Borrower                Date | | Borrower                Date | |
| | | | |
| Borrower                Date | | Borrower                Date | |
| | | | |
| Borrower                Date | | Borrower                Date | |

5% - 5 yrs
XIN # 3041761C0070508950
AHL PPR-3.UFF

JACKSON
Page 1 of 1

Loan # 0507C26916

THIS IS A TRUE AND EXACT COPY OF THE ORIGINAL DOCUMENT.

CERTIFIED BY
ACCREDITED HOME LENDERS.
BY: